## KETCHUM VS. WELLS and others.

A contract to deliver to the defendants, who were manufacturers of barrels and staves, a certain quantity of stave bolts, interpreted to require the delivery of bolts of a good merchantable quality, and suitable for the purpose for which they were intended.

It appearing that defendants' factory was a hundred miles from the place where the bolts were to be delivered, that they depended upon a supply of bolts under the contract to keep the mill in operation, and caused a portion of those got out for them by plaintiff to be transported to the mill and there used : *Held,* in an action against them upon the contract, that they were entitled to show that the bolts so received were not such as the contract called for, and to recoup their damages.

Defendants having refused to receive a part of the bolts piled for them at the place of delivery, on the ground that they were not of suitable quality and length, it was error for the court to instruct the jury that "if a small and inconsiderable number of the bolts in the piles were too short or of bad quality, the defendants had no right to reject them for that reason, if there were enough of the good ones to fill the contract; but if a large part of them were so deficient that it would be difficult to make the necessary deduction upon the measurement, the defendants might reject them;" and afterwards to refuse an instruction "that they must be so corded as not to require assorting in order to make them merchantable, and that defendants were not required to assort or cull them."

APPEAL from the Circuit Court for *Columbia* County. The plaintiff and the defendants entered into a contract un-

der seal, by which the former undertook to deliver at certain points on the Wolf and Embarrass rivers, "one thousand cords of oak stave bolts, thirty-two inches long, one length of bolts to be counted as a cord;" five hundred cords to be delivered by the 15th of July, 1862, and the balance by the 15th of October following. At least five hundred cords of the quantity named were to be "barked" before delivery; and the defendants were to pay $1.90 a cord for such as were barked, and $1.62½ for those delivered with the bark on. The complaint alleges, in substance, that the plaintiffs delivered under the contract five hundred cords before July 15th, and three hundred and fifty-seven cords additional before October 15th, 1862, and was ready and willing to deliver the remaining one hundred and forty-three cords called for by the contract before the last mentioned date, but abstained from doing so at the request of the defendants; that of those delivered 479 cords were barked, and 378 cords not barked; that all were of the kinds, length and quality mentioned in the contract; that the defendants were notified of their delivery and requested to take them away; that defendants had paid on said bolts $762, and had refused to pay the remainder of the contract price, to-wit, the sum of $762.34, or any part thereof. There is a second cause of action stated for labor of plaintiff's servants in loading a portion of said bolts upon boats for the defendants, amounting to $26; and judgment is demanded for $788.34, besides interest, &c.

The answer denies all the allegations of the complaint not therein expressly admitted, and alleges that at the time said contract was made defendants were the owners and operators of a mill or factory for the manufacture of barrels and staves at Portage, Wisconsin; that it was very important to them that the stave bolts furnished under the contract with the plaintiff should be of the description specified in said contract, and be delivered by the time therein limited; that the dimensions of said bolts and the time of delivery were both material matters

in the making of said contract; that previous to said 15th of July plaintiff delivered at the places mentioned in the contract very few if any stave bolts; that previous to the 15th of October he had not delivered the 1,000 cords, and defendants deny that his neglect to deliver the full number was at their request or with their permission. The answer further alleges that of those bolts delivered a large part were worthless to the defendants for the purpose of manufacturing staves, by reason of their being knotty, rotten, shaky and worm-eaten; that very few if any of them were of the length required by the contract and necessary for the manufacture of staves, and for that reason a large portion of them were entirely valueless to the defendants except for fuel. The answer further alleges that about August 21, 1862, they sent one Harvey Smith, who was in their employ, to the place where said bolts were to be delivered, for the purpose of obtaining and transporting the same from Wolf river to their mill, a distance of more than 100 miles; that on examining the piles of bolts Smith found that a large portion of them could not be manufactured into staves, and were worth less than the cost of transportation from there to Portage; that said Smith, well knowing that the said defendants were depending mainly upon this as their source of supply for the mill, and were anxious that said mill should not stop, assorted out sufficient for one load, which, though not such as required by the contract, the defendants preferred to take rather than have their mill stop; that said Smith, as agent for the defendants, told the plaintiff that a large portion of the bolts were unfit for use, and that unless he was more particular and delivered bolts in accordance with the agreement defendants would not accept them; that they received of said bolts at different times from August 21 to September 26, 1862, until they had received in all 400 1-2 cords, of which 286 1-2 cords were barked and 114 cords not barked; that of the former 30 cords, and of the latter 13 cords were wholly worthless and were not used by defendants except for fuel; and that a large

portion of those they did use were used solely from necessity, to keep their mill in operation, the dimensions of a great majority of them not being such as were required by the contract; that about October 5, 1862, defendant *Horace E. Wells* went to the place where said bolts were to be delivered, and informed plaintiff that defendants would not receive any bolts that were not in accordance with the requirements of the agreement, nor unless they were delivered by October 15th; that plaintiff did not complete his contract by that date, whereupon defendants refused to receive any more of said bolts; and that they have paid plaintiff more than the full value of the bolts received by them. "And the defendants, further answering," deny in general terms that plaintiff had fulfilled his contract, and "claim to have allowed them, by way of recoupment or otherwise, such damages as they shall prove to have resulted therefrom." The answer then alleges specifically damages in the sum of "at least $500" from the stoppage of their mill, &c., by reason of plaintiff's failure to fulfill his contract, and that the defendants would claim to have the same allowed them "by way of payment, reduction, set-off or otherwise, against any claim" which might be established against them in this action. The answer also denies the second cause of action set out in the complaint. It further sets up a counter-claim for $111.54, as an amount paid by defendants to plaintiff for said bolts in excess of the actual value of those received by them.

The plaintiff's evidence tended to show, among other things, that 500 cords of stave bolts were cut by him for defendants and piled at the points named in the contract, before the 15th of July, 1862; that between three and four hundred cords more were so piled before the 15th of October following; and that defendant *Horace E. Wells*, at plaintiff's house, about October 5th, requested plaintiff not to get out the whole number contracted for, on the ground that they could get others more cheaply at Portage City. Plaintiff's evidence also showed that defendants' agent, Harvey Smith, who went up the river to re-

ceive the first boat load, "complained of the quality of the bolts, that they were knotty and worm-eaten, and that some would not work;" that by consent of the plaintiff the four boat loads (of about 100 cords each) shipped to defendants, were culled by said Smith, or by the captain of the boat who took them. As to the quality of the bolts, one of the plaintiff's witnesses who had worked in getting out a portion of them, and had subsequently examined all the piles refused by defendants, testified: "The bolts remaining, take them together, are of a better quality than those taken away; better timber. Taking them as they run, they are a good fine lot of bolts; some defective, but mostly good; as good as other bolts that I have seen cut out for the same purpose up there. Some of them are rotten; don't know how I can get at the quantity. Some have a rotten streak in the middle near the heart. Some are affected slightly, and the balance good. I could not estimate how many are defective; should think four or five cords slightly affected; not one half cord entirely rotten. I could not guess how many are rotten; it is so long since I have seen them. Some are affected by worm holes; perhaps three or four cords." Another of plaintiff's witnesses said: "My business is making staves for barrels; I am not a cooper; have been in the stave business since a year ago last fall. I have examined the bolts in controversy twice; measured a portion of them. When I saw one I thought too short, I measured it. The bolts on the Embarrass and the lower part of the Wolf, I think good." Of those on the Upper Wolf, constituting, as he stated, about two-thirds of the whole, witness said: "These were not so good as those below. In piling them they were not so well selected; some were good and others poor. I think they ought to be culled to make them merchantable. I think a deduction of three per cent. would make them merchantable. I found some 31 1-2 inches." The plaintiff himself testified: "I have seen these and other bolts; never saw any better [for so large a quantity; I call them a very good

lot." On cross-examination he said that " *Wells* found fault with the bolts." *Question.* "Did *Wells* say that 40 cords of those brought down were worthless." The question was ruled out, on the ground that those brought away had been accepted, and defendants could not show that they were not according to the contract.—A witness for defendants testified that he was foreman of a stave manufactory at Appleton, and had resided there over four years; had dealt in staves and barrels ever since 1847; knew what were merchantable bolts at Appleton; had examined the piles on the Upper Wolf of the bolts in controversy; did not think more than one half of them were merchantable; and all the varieties were mingled together. Defendants introduced other evidence tending to show that a large portion of the bolts were defective and unmerchantable; and that the different qualities were for the most part intermixed in piling. The evidence further showed that the bolts were so loosely piled, that large deductions were required to be made from the measurement on that ground, in determining the quantity.

The court gave the following, among other instructions : " I think that the contract requires that the bolts should be corded by the plaintiff on the banks of said rivers, in such way that they could be properly measured *or estimated.*" The last two words excepted to. "Something has been said as to whether the contract requires that all the bolts in the piles should be of the proper quality and length, and whether they should be closely and perfectly corded. On these points the contract should have a reasonable construction. If a small and inconsiderable number of the bolts in the piles should be too short or of bad quality, I do not think the defendants would have the right for that reason to reject them, if there were enough of the good ones to fill the contract; but if a large part of them were so deficient that it would be difficult to make the necessary deduction upon the measurement, then I think the defendants might reject. And so also as to the

manner of cording; if they were so loosely corded that it would be difficult to measure them, they might te refused for that reason; but if they were corded reasonably well, and so that they could be measured or estimated with reasonable certainty, then it would be no excuse for rejecting them if the amount in the aggregate is sufficient." So much of this as implies " that defendants were compelled to assort or estimate the bolts," was excepted to. Defendants asked the following instruction: "The plaintiff must satisfy you that he had delivered the stave bolts required by the contract, suitably corded to be measured with reasonable precision, *and so as not to require assorting in order to make them merchantable; and the defendants are not required to assort or cull them.*" The judge gave this instruction except the part in italics, which he refused to give.

Verdict for the plaintiff for $557.28. Motion for a new trial denied; and judgment upon the verdict; from which the defendants appealed.

*Alva Stewart* and *Emmons Taylor*, for appellants, urged that the court erred in refusing to instruct the jury that the defendants were not required to assort or cull the bolts; and also erred in excluding evidence of the quality of the bolts taken to the defendants' mill; citing to the latter point Chitty on Contracts (8th Am. Ed.), 400; *Mondel v. Steel*, 8 M. and W., 858, 871; 2 Smith's L. C. (4th Am. Ed.), 16, 17; *Street v. Blay*, 2 Barn. and Adolph., 456, 463; *Fisk v. Tank*, 12 Wis., 276; *Rountree ads. Getty*, 2 Chand., 28; *Shields v. Pettie*, 4 Coms., 122; *Muller v. Eno*, 4 Kern., 597; 3 Barb. (S. C.), 424; 10 Cush., 88; Sedgw. on Dam., 289–90; *Sigerson v. Harker*, 15 Mo., 101; *Babcock v. Trice*, 18 Ill., 420.

*C. Coolbaugh*, for respondent, in support of the instructions given by the circuit court, cited *Howard v. Hoey*, 23 Wend., 350; *Wright v. Hart*, 18 id., 449.

*By the Court*, COLE, J. The circuit court was undoubtedly

correct in holding that the contract set out in the complaint requires that the stave bolts which should be delivered upon it must be of a good merchantable quality and suitable for the purpose for which they were intended. The contract was an executory one, and there was an implied warranty that the bolts should be of this quality and of the requisite length, otherwise the defendants would not be obliged to accept them. This rule is well settled by the authorities ; but it is only necessary to refer to the cases of *Rountree v. Getty*, 2 Chandler, 28, and *Fisk v. Tank*, 12 Wis., 276, where the question has been fully considered by our own court.

It appears, however, that a certain quantity of bolts were delivered and used by the defendants in stocking their mill. It is alleged by the defendants in their answer, that a portion of these bolts which were thus delivered were worthless for the purpose of manufacturing staves, by reason of being knotty, rotten, worm-eaten and of such timber as could not be made into staves, but that an assorted quantity was taken, although not such as required by the contract, rather than have their mill stop operations. They claimed that they were entitled to a deduction proportioned to the diminished value from the price agreed upon in the contract, in consequence of this defect in the bolts. The court however held, and so ruled in the progress of the trial, that the quality of the bolts taken away by the defendants could not enter into the consideration of the case, and that the defendants could not, under their answer, recover damages by way of recoupment for a breach of warranty as to their quality.

We are unable to concur in this view of the case. It appears to us that the answer sufficiently sets up the defect in the bolts, and that evidence to show that they were of an inferior quality should have been admitted. Unless the jury should be satisfied from all the evidence that the bolts which were delivered were received and accepted by the defendants, after a suitable opportunity to inspect them, as being such bolts as

were required by the contract, and were of a good merchantable quality, they might object to the payment of the contract price. The mere fact that the defendants received a portion of the bolts, and brought them to their mill and used them to keep their mill in operation, ought not, under the circumstances, to be held a waiver of the implied warranty. The bolts were to be delivered at a point distant from the defendants' mill, and some of the defects would probably not be discovered until they were used. Besides, it is. alleged that the defendants relied on these bolts to stock their mill and keep it in operation. They could not, therefore, without great injury, return the bolts, and the fact that they did not, but kept and used them, ought not to be deemed a waiver of the right to object that the bolts were not such as the contract called for. This position is sustained by many well adjudicated cases, and we cannot see that it violates any sound, just principle or rule of law. *Poulton v. Lattimore*, 9 Barn. and Cress., 259 ; *Street v. Blay*, 2 Barn. and Adol., 456 ; *King v. Paddock*, 18 Johns., 141 ; *Babcock v. Trice*, 18 Ill., 420; 2d Smith's Lead. Cases, 31 et seq. We think the court erred in not permitting the defendants to show under the answer the actual defects in the quality of the bolts which were delivered and kept by them, as a reduction of the damages from the contract price.

We likewise think there was an error in the charge of the court upon the other branch of the case, in respect to the bolts which the defendants refused to receive. The defendants asked the court to instruct the jury, among other things, that they must be satisfied from the evidence that the plaintiff had delivered the stave bolts required by the contract, suitably corded to be measured with reasonable precision, and so as not to require assorting in order to make them merchantable, and that the defendants were not required to assort and cull them. The court refused to give such an instruction, but, in the general charge, instructed the jury upon this point that the contract must have a reasonable construction ; and that if a small and

inconsiderable number of the bolts in the piles were too short or of a bad quality, the defendants would not, for that reason, have the right to refuse them, provided there were enough of the good ones to fill the contract; but that the defendants might refuse to receive the bolts if a large part of them were · so deficient that it would be difficult to make the necessary deduction upon the measurement.

We have already said that the contract called for good merchantable bolts suitable for the purpose for which they were intended. They were to be delivered at certain points on the Wolf and Embarrass rivers, " one length of bolts to be counted as a cord." It was the duty of the plaintiff to have such bolts as the contract required properly corded up at the points of delivery, and he had not discharged his duty until he had done this. The defendants were under no obligation to cull and assort the bolts, nor to receive any which did not conform to the contract. The court held that if a small or inconsiderable number of the bolts in the piles were too short or of a bad quality, the defendants would not for that reason have a right to reject the whole if there were enough of the good ones to fill the contract. According to this view the defendants were required to receive bolts of a defective quality, or be to the labor and expense of assorting and cording the bolts for measurement. The contract imposes upon them no such obligation. See *Crane v. Roberts,* 5 Greenl., 419; *Elkins v. Parkhust,* 17 Vermont, 105; *Goss v. Turner,* 21 id., 437; *Clark v. Pinney,* 7 Cowen, 681.

We think, for the reasons abov given, that there must be a new trial in this case.

Judgment of the circuit court reversed, and a new trial ordered.