WEINHAGEN, Respondent, vs. HAYES and others, Appellants.

*May 6—July 3; 1920.*
*January 15—May 31, 1921.*

*Principal and agent: Principal charged with knowledge of agent: Real-estate brokers: Accepting commissions from both principals: Effect: Rescission on discovery of fraud: Cancellation: Discretion of court: Waiver of right to rescind: Appeal: Weight accorded general findings: Principal and surety: Release of surety upon rescission: Accounting: Second application for rehearing.*

1. Where a landowner in negotiating a lease of his property was represented throughout the entire transaction by an agent, the landowner, who paid commissions to certain persons who in fact represented the lessees, is charged with whatever knowledge his agent may have had as to such persons' agency for the lessees. *On rehearing:* The lessor's agent in negotiating the lease with agents who did not pretend to be negotiating in their own behalf was chargeable as a matter of law with knowledge of the fact that the agents represented some undisclosed principal.
2. An agent's duties are not lessened or modified because he calls himself a broker or factor, and agents representing prospective lessees are not justified in accepting commissions from the opposite party, regardless of custom.
3. Though a lessor, who paid commissions to the agents representing the lessees without their knowledge or consent, had no fraudulent purpose, his act whereby he made the lessees' agents his own is a fraud upon the lessees.
4. Where the lessor, without the knowledge or consent of the lessees, paid commissions to their agents, the lessees on discovery of the fraudulent conduct of their agents have a right to rescind the contract.
5. An application for the cancellation or rescission of a contract is addressed to the sound discretion of a court of equity.

6. The rule that the appellate court will not overturn findings of the trial court unless against the clear preponderance or the great weight of the evidence does not apply to findings which are general in their nature.

7. In an action by a lessor to recover amounts due under a long-time lease which the lessees rescinded for fraud, the lessor having made payments to their agents, the evidence is *held* to establish the fact that the lessees did not learn of the payments until a few months before the rescission.

8. The fact that the lessees, after discovering that the lessor had made payments to their agents who negotiated the lease, attempted to dispose of the property, while a circumstance on the question of waiver of the right to rescind is not conclusive.

9. Where the facts as to the conduct of the lessees, after discovering that their agents had received commissions from the lessor, were not in dispute, the question whether they had waived the right to rescind the contract is one of law.

10. An inference of intent to waive the right to rescind does not readily arise where the situation in which the party required to elect finds himself is the result of the fraud or misconduct of the opposite party.

11. Where the rights of the parties in nowise changed after the lessees discovered that the lessor had paid commissions to their agents, mere delay of a few months on the part of the lessees in announcing an election to rescind will not establish a waiver of such right, the lessees having incurred large obligations outside of and beyond the contract and having expended considerable sums of money.

12. A surety on a bond given by a lessee is not liable where the lease was rescinded for the lessor's fraud in paying commissions to the lessee's agent, the obligation in nowise guaranteeing the genuineness of the lease.

13. Where the parties entered into a long-time lease, and the lessees, on discovering that the lessor had made payments to their agents, elected to rescind, they should, in so far as possible, be placed *in statu quo,* and there should be an accounting between them; but the lessor is not chargeable with losses due to the faults or mismanagement of the lessees, and the latter, who must return the property to the lessor, cannot recover any sums paid by him to their agents.

14. A second application for rehearing was denied as not proper practice.

SIEBECKER, C. J., and VINJE and JONES, JJ., dissent.

APPEAL from a judgment of the circuit court for Milwaukee county: EDWARD T. FAIRCHILD, Circuit Judge. *Reversed.*

The plaintiff is a resident of the city of Milwaukee and the owner of certain real property. The land increased in value so as to make it unprofitable for renting purposes with the buildings then on it. He did not care to make the necessary investment for the purpose of erecting buildings, and indicated to one Schenck, a real-estate agent, that he would lease the property upon satisfactory terms. The defendant Hyatt was a resident of Detroit, and associated with Harvey and McClure in real-estate deals. Hyatt was a friend of the defendant *Carrow* and introduced *Carrow* to McClure, whom they sought to interest in a long-term lease proposition in the city of Milwaukee. *Carrow* brought the matter to the attention of his business associate, *H. J. Hayes.* McClure then presented the matter to *Hayes* and *Dr. McFall,* another friend of *Carrow,* and an arrangement was made by which McClure and Harvey were to procure a long-time lease on Milwaukee property for *Hayes, Carrow,* and *McFall.*

McClure and Hyatt visited Milwaukee and there met Carl Remeeus and plaintiff's agent, Otto Schenck. Negotiations were entered into between McClure and Hyatt on one side and Schenck on the other, with Remeeus interested, and finally on October 2, 1911, *Weinhagen* executed a lease to *Hayes,* which was signed by *Hayes* on October 13, 1911. The lease as finally signed was substantially in the form proposed by *Weinhagen.* In the meantime, in August, *Hayes* and *Carrow* had visited Milwaukee, had seen the property, but made no further investigation in regard to it. Before McClure and Hyatt would disclose their principal they demanded a commission of $12,000 from *Weinhagen,* in which Schenck was to share. It was finally agreed that

McClure and his associate, Harvey, and Hyatt were to receive $6,000 from *Weinhagen,* the remaining $3,000 of the $9,000 which *Weinhagen* had agreed to pay to be taken by Schenck.

By the terms of the lease the lessee was required to give a bond to secure the performance of its conditions, and on November 17, 1911, *Hayes, Carrow,* Bartholomew, another associate of *Hayes, McFall,* Harvey, and McClure signed the bond. E. H. McFall, father of *Dr. Guy H. McFall,* guaranteed the performance of the bond so far as his son was concerned. Harvey, McClure, Hyatt, and Remeeus then received the $6,000, of which $2,000 was in cash and the balance in notes due in 1913 and 1914, but payable only if the taxes were paid by *Hayes* to and including 1914. Harvey and McClure then sold the notes to Remeeus at a discount. The defendants *Hayes, Carrow, McFall,* and Bartholomew had an arrangement with Harvey and McClure by which Harvey and McClure were to receive as compensation for conducting the negotiations on the part of *Hayes* and his associates, a one-fourth interest in the net profits which should result from the transaction.

In 1913 *Hayes* did not pay the taxes when they became due. Remeeus therefore could not collect the commission notes which he had purchased from Harvey and McClure. Remeeus arranged to have a company organized which company should loan *Hayes* money enough to pay the taxes, *Hayes* giving his notes for $6,400 to the company. Remeeus took the $2,000 commission notes to *Weinhagen* with $6,200 in cash, and *Weinhagen* paid the taxes, *Hayes* in the meantime having assigned the lease to the company which loaned him the money, as collateral for his note, the lease being executed by *Hayes* individually, for himself and his associates *Carrow, McFall,* and Bartholomew.

The property continued to run behind, *Hayes* defaulted in the payments of rents, and in 1915 *Weinhagen* brought

suit for the unpaid rent, and in this suit Remeeus was appointed receiver. This was done to prevent the company which held *Hayes's* note from collecting the rents. Remeeus remained receiver down to the time of the trial.

On behalf of *Hayes* and his associates it is claimed that they had no knowledge of the payment by *Weinhagen* of commission to Harvey, McClure, and Hyatt until the month of July, 1916. In November, 1916, *Weinhagen* began this action. *Hayes, Carrow,* and *Guy McFall* answered January 30, 1917, and in their cross-complaint set up the payment of the double commissions, charged *Weinhagen* with fraud, and repudiated the lease and bond.

The trial court found that the plaintiff had paid commissions as hereinbefore stated; that McClure and Harvey had produced *H. J. Hayes* as a customer for the lease; "that at the time of the agreement to pay and the payment of such commissions to said McClure, Harvey, Remeeus, one Clark C. Hyatt, and Schenck, and at all times prior to the execution, delivery, and acceptance of said lease and for a long time thereafter, the plaintiff was without any knowledge or notice that any or either of them were in the employ of or represented the defendant *Hayes* or any of his associates in any manner whatsoever, or that they were, or any of them was, in anywise interested with the said *Hayes* or his associates in the profits to be derived by the lessee of said premises, or in anywise acting or undertaking to act for the defendant *Hayes* and his associates, or any or either of them;" that there was no conspiracy between the defendants Harvey and McClure and Hyatt and plaintiff; found the facts in relation to the default of the lessee, *H. J. Hayes,* from which it appears there was due at the time of the trial from *Hayes* large sums; found further that *H. J. Hayes* had not commenced the construction of a building upon the premises, as he was required by the terms of the lease to do, and that in consequence of his failure to do so there was due

to the plaintiff $15,000 as liquidated damages, with interest; that by reason of the defaults of the defendant *Hayes* there was due to the plaintiff on the 17th day of June, 1918, the sum of $35,325.93, principal and interest; found the facts in regard to the execution of the bond, and "that Eugene McFall died in the month of January, 1917 (this action having been commenced November 25, 1916), a resident and inhabitant of Erie county, Ohio, leaving a last will and testament, duly admitted to probate in the court of proper jurisdiction in such county, and naming *Guy H. McFall, Anna J. McFall,* and *Elizabeth A. Lewis* as executors; . . . that the action was revived against such executors by their entering their appearance upon the trial of this action and by specific consent being given in open court, and answer and cross-complaint were made and filed by them, such consent being limited to cover the revival of the action as it then stood; that later in the proceedings upon the trial, plaintiff amended his complaint so as to charge additional defaults as in the amendment on file set forth, to which amendment counsel for said executors objected, insisting that he had no authority to consent to the revival of the action, excepting as it stood before the amendment;" further, the facts in relation to the receivership, and "that the defendants W. C. McClure and H. B. Harvey were the agents of *H. Jay Hayes* in the matter of negotiating the said lease, and represented the said *Hayes* and his associates in the negotiation of the lease, and were to receive as their compensation for acting as such representatives a proportion of the profits, if any, made in the transaction; and neither said Schenck, nor said Remeeus, was in any manner such agent or so represented said *Hayes* or his associates, and was in no manner employed or engaged by any or either of them and had no interest in any such compensation or profits;" and further found "that after having knowledge (before the commencement of this action) of the payment

by the plaintiff of the moneys aforesaid to the defendants Harvey and McClure, and of the payment by the said Harvey and McClure of a part thereof to said Clark C. Hyatt, the defendants *H. Jay Hayes, H. P. Carrow, Guy H. McFall,* and R. A. Bartholomew continued to exercise acts of ownership of said premises under and by virtue of the lease and elected to hold and assert the interest of the lessee therein, and have by their conduct, since obtaining such knowledge, waived their rights, if any they ever had, to have said lease or bond canceled, and have elected to retain said lease and the benefits thereof."

The proper and necessary conclusions of law followed, and judgment was rendered in favor of the plaintiff against *Hayes* for the sum of $22,976.40; and in favor of the plaintiff against *Carrow, Guy H. McFall,* McClure, Harvey, and R. A. Bartholomew, and *Guy H. McFall, Anna J. McFall,* and *Elizabeth A. Lewis,* as executors of the last will and testament of Eugene McFall, for the sum of $15,000, the amount of the bond; and dismissed the cross-complaint of the defendants upon the merits. From such judgment the defendants *Hayes, Carrow, Guy H. McFall,* and the executors of the estate of Eugene McFall, appeal.

For the appellants there were briefs by *Miller, Mack & Fairchild* of Milwaukee and *Beaumont, Smith & Harris* and *Henry C. Walters,* all of Detroit; and the cause was argued orally by *Mr. Hal H. Smith* and *Mr. Walters.*

For the respondent there was a brief by *John H. Paul* and *Glicksman, Gold & Corrigan,* all of Milwaukee, and oral argument by *Nathan Glicksman.*

The following opinion was filed July 3, 1920:

ROSENBERRY, J. We wish to commend the careful, lawyer-like, and thorough manner in which this case has been prepared for presentation to this court by the attorneys on both sides. We are furnished with a printed case, the

index to the exhibits gives a short statement as to what the exhibit is; an index which simply says that exhibit so and so may be found on page so and so, requires us to look at a large number of exhibits before the one which we seek may be found. A short statement, as "Letter Remeeus to *Carrow,* June 3, 1916," indicates in a general way the character of the exhibits and saves much time and search here. Each of the briefs is arranged in an orderly way, and at the beginning of the brief is a subject index which refers in detail to the matters set out in the brief, contains an outline of the argument, and authorities presented, with references to the pages of the brief on which the various topics are discussed. Such an index or outline is very helpful in our study and consideration of the cases here, and requires but comparatively little time for preparation on the part of attorneys. Such an index or outline is required under the rules of the United States supreme court. While up to the present time we have not felt warranted in adopting such a rule here, our labors would be greatly lightened, and we should be able to give more time to important matters, if in cases involving many points such an outline were made and printed at the beginning of the brief. In the present assignment there are thirty-four cases, containing 3,861 pages, in which hundreds of cases are cited. Manifestly anything which saves us time in searching through briefs, page by page, enables much more time to be devoted to matters of argument and authority. This practice has been adopted in many cases heretofore presented, and we take this occasion of commending it to the attention of the profession generally.

We shall not attempt to treat in detail all of the questions raised and argued in briefs of counsel. We shall first dispose of the question raised as to whether or not the plaintiff was charged with the knowledge of Schenck, his agent, in respect to the transactions relating to the negotiation and execution of the lease in question. The trial court did not

find directly upon this point, but found that the plaintiff had agreed to pay McClure, Harvey, and Remeeus $6,000, and had agreed to pay Schenck $3,000, upon procuring a lessee of the premises who would accept a lease prepared by the plaintiff and embodying terms dictated by him. We have carefully considered the argument of counsel and the evidence, and are convinced that Schenck was the agent of *Weinhagen* and not a mere middleman employed to sell a specified definite property upon a commission. The whole transaction arose through the suggestion made by the plaintiff to Schenck that he desired to procure a long-time lessee for the property. Throughout the negotiations Schenck represented plaintiff, and we are of the opinion, therefore, that the plaintiff must be charged with whatever knowledge Schenck had as to the agency of McClure, Harvey, and Hyatt.

The trial court found that the persons aforesaid, that is, McClure, Hyatt, Remeeus, and Schenck, merely produced the defendant *H. Jay Hayes* as a proposed lessee. We think this finding is clearly against the preponderance of the evidence. It appears practically without dispute that McClure and Harvey and their employee, Hyatt, came to Milwaukee for the purpose of looking up a lease, and throughout the entire negotiation, down to the point where they demanded a commission, represented an undisclosed principal and not themselves. When the negotiations had proceeded so far that the introduction of the proposed lessee was necessary, McClure and Harvey made a demand for the commission in question. It taxes human credulity to believe that under such circumstances Schenck did not know that McClure and Harvey represented the proposed lessee.

When *Hayes* and his associates came to Milwaukee they made no inquiry in regard to the property, no investigation of local conditions, but simply viewed the property and took a general survey of the city, and it is established beyond

question that they relied upon their agents, McClure and
Harvey, throughout the entire negotiations. We find no
evidence in the record as to any specific knowledge that the
plaintiff had in regard to the relationship between McClure,
Harvey, and Hyatt and the lessees, but that Schenck had
such knowledge seems to us to be established beyond ques-
tion.

The plaintiff being chargeable, therefore, with knowledge
of the fact that McClure and Harvey were the agents of
*Hayes* and his associates, what effect upon the contract did
the payment of the $6,000 by the plaintiff have? It is
argued that the circumstances here are within the principles
referred to in *Tasse v. Kindt,* 145 Wis. 115, 128 N. W. 972.
In that case it was held that a broker who undertakes merely
to procure a customer for land at a price fixed by the seller
is in reality only a middleman and is entitled to the agreed
commission for such service, even though by an agreement
unknown to the seller he is also to receive a commission
from the purchaser. In the present case the agents of the
lessees were not agents to procure a long-time lease at a
fixed price, but represented their principals in securing a
location of the property, fixing the terms and conditions
of the lease, upon which its value very largely depended,
and throughout a long period of negotiation attempted to
secure a contract which would be acceptable to their clients
and in the judgment of the agents a profitable investment.
They were invested with large discretion in many respects.
They cannot be said in any sense of the term to have been
mere middlemen. The question cannot be regarded solely
from the standpoint of the plaintiff, but in considering the
effect upon the contract of the double agency the relationship
of the double-dealing agents to both parties to the transaction
must be considered.

It is the established law that the acceptance by an agent
of a secret commission of compensation from the opposite

Weinhagen v. Hayes, 174 Wis. 233.

party, where the agent is to exercise, on behalf of his principal, skill and judgment, vitiates the contract, and the principal who has thus been imposed upon may rescind the contract even though the other party paid the commission or compensation in good faith. 2 Mechem, Agency (2d ed.) § 2138, and cases cited.

Absolute fidelity and loyalty to the interests of his principal is the first duty and the highest obligation of an agent. An opposite party negotiating a contract with an agent may not deprive the agent's principal of the benefit of the agent's skill and judgment by paying him a commission, without the full knowledge and consent of the principal, and if he does so it operates as a fraud, actual or constructive, upon the principal, and he may for that reason repudiate the transaction.

The perusal of the testimony of some of the witnesses in this case indicates that there is a very confused state of mind on the part of many real-estate agents as to their rights, duties, and responsibilities in transactions of this kind. The payment of compensation or a commission to the agent of the opposite party is in some states punishable as an offense under the law. More and more the business world is compelled to rely upon the fidelity of agents in the transaction of business, and an agent who undertakes to negotiate a contract or transact business for a principal should be held strictly accountable for the faithful performance of his duty. An agent's duties or responsibilities are not lessened or modified because he calls himself a broker, factor, or by some other name. The thing that fixes his duty and responsibility is the character of the service which he undertakes to perform and not the style or the name under which he does business. Usage or custom, however long continued, does not warrant unfaithful, disloyal conduct on the part of an agent. Such conduct is abhorrent to the letter and spirit of the law and cannot be justified under its forms.

Upon the undisputed facts in this case the plaintiff made
the agent of the lessees his agent without the knowledge or
consent of the lessees.    While the plaintiff had no guilty
intent or .fraudulent purpose, his act operated nevertheless
as a fraud upon the lessees.    1 Black, Rescission and Can-
cellation, § 34, and cases cited.

It follows from what has been said that upon the dis-
covery of the fraudulent conduct of their agent the lessees
had a right to rescind and repudiate the contract, but the
law requires, under such circumstances, that the lessees
should act without unnecessary delay and with due prompt-
ness.    This brings us to the most serious question in this case.

An application for the cancellation or rescission of a con-
tract is addressed to the sound discretion of a court of equity.
*Stimpson v. Stimpson,* 168 Wis. 146, 169 N. W. 295.    The
trial court found that, after having knowledge of the fraud,
the lessees continued to exercise acts of ownership over the
premises described in the lease and elected to retain the
lease and waive their rights, if any they had, to cancellation.
This finding of the trial court, more fully set out in the
statement of facts, is a mixed conclusion of fact and law.
We are not told at what time or times the lessees received
such knowledge, or what act or acts upon their part con-
stituted a waiver or election.    As has been stated many
times, this court will not overturn findings of the trial court
unless they are against the clear preponderance or the great
weight of the evidence.    This rule, however, does not apply
to findings which are general in their nature.    *Damman v.
Damman,* 145 Wis. 122, 128 N. W. 1062.    See, also, *Harri-
gan v. Gilchrist,* 121 Wis. 127 (99 N. W. 909), at p. 312
*et seq.;* and *McMillen v. Strange,* 159 Wis. 271, 150 N. W.
434.

The question of whether or not there was a waiver or
an election was put sharply in issue by the pleadings and
was thoroughly litigated upon the trial.    On behalf of the

plaintiff it is contended that the lessees at all times knew that a commission was to be paid by the plaintiff to McClure and Harvey. In that respect it is claimed that while on a train between Milwaukee and Chicago in October, 1911, Hyatt told *Carrow, Hayes,* and their attorney that Harvey and McClure were receiving a commission. He says he told them in the following language, in response to a question from *Carrow,* "Why, McClure can tell you about that;" and McClure said, "Yes, we are receiving a small part of the commission given the Milwaukee brokers, which, however, will not pay our expenses." He does not say that any information was given as to who was paying the commission, or any information as to the amount of it or when it was to be paid. Hyatt is the only one who testifies to this conversation. He relates circumstances in connection with it which, as conclusively shown by other evidence, could not have occurred. After a careful examination of the record we are of the opinion that Hyatt's testimony as to this transaction, even if worthy of belief, is insufficient to bring home to the lessees knowledge of the true situation. It is thoroughly discredited. McClure attempts to corroborate it, but admits that his recollection is hazy, due to the number of cocktails which he had consumed. His corroboration is of very little if any value. In addition to that, the conduct of the parties subsequent to the time is wholly inconsistent with any knowledge on their part of the true nature of the transaction, and their suspicions were apparently not aroused in any way. Contrasted with their conduct after they admittedly had full knowledge, their lack of objection is a very convincing circumstance that they received no notice and were not put upon inquiry at that time.

On behalf of the plaintiff it is argued that late in 1913 or early in 1914 the attention of *Carrow* and *Guy H. McFall* was expressly called to the fact that the plaintiff had paid a commission to Harvey and McClure. Evidence as to this

transaction rests entirely upon the evidence of Hyatt, but in his testimony Hyatt describes circumstances which show conclusively that at the time he arrived in the office where the interview took place the lessees were in possession of full information. Upon his arrival there he was charged with wrongful conduct, advised that had the lessees known of the payment of the commission they would not have entered into the deal, and he describes the session as a "stormy interview." From a careful examination of the record we are convinced that the testimony of Hyatt relates to an interview some time after the lessees had acquired knowledge as to the payment of the commission.

It is claimed that the defendant *Hayes* should have been put upon inquiry by a remark made by Remeeus to *Hayes* in response to a suggestion made by *Hayes* that no one but Remeeus seemed to be taking any interest in the property. Remeeus is said to have replied, "The probable reason is that the other brokers received their commission; mine is still in jeopardy." If this statement were taken at its face value it would not apprise the defendant of the real facts and circumstances connected with this transaction. It is to be remembered that Remeeus was at this time endeavoring to make an arrangement with *Hayes* so that the taxes would be paid, in order that Remeeus might collect the notes given by *Weinhagen,* which were conditioned upon payment of the taxes. It is not very probable that he would have made statements to *Hayes* which would have tended to arouse the suspicion of *Hayes* as to the legality of the entire transaction.

It is admitted that on July 28, 1916, Remeeus wrote to *Carrow* giving him full information as to the payment of the commission, and it further appears that a short time previous to the writing of this letter Remeeus had a conversation with *Carrow* to the same effect.

After a careful examination of the evidence we are brought to the conclusion that the evidence does not sustain

a finding that the lessees had knowledge of the payment of the commission or of facts which should have put them upon inquiry previous to July, 1916.

There is evidence in the record which it is claimed sustains the finding to the contrary, such as an intimation in a letter from McClure to *Carrow,* in which McClure says that his integrity has been questioned; but the correspondence shows that this complaint relates to McClure's failure to carry out the terms of the contract by which Harvey and McClure were to look after and care for his property. There are also some statements made in the depositions which relate to time, but a reading of the testimony convinces us that the circumstances recited indicate that the witnesses were, as they subsequently claim, mistaken as to the time. The whole correspondence and course of dealing between the parties indicate very strongly and conclusively that the lessees did not have knowledge of the wrongful conduct of their agents until July, 1916. We shall not attempt to recite all of the circumstances which lead us to that conclusion.

It is argued very forcefully on behalf of the plaintiff that after receiving the letter of Remeeus in July, 1916, the lessees deliberately elected to continue as the owners of the leasehold estate, and thereby waived their right of rescission. In the letter of July 28, 1916, Remeeus wrote to one of the lessees:

"Right here let me state that this commission was paid as follows: Schenck received $3,000; Hyatt $2,000; Harvey-McClure Co. $2,000; myself and another Milwaukee broker the other $2,000."

It seems that a broker by the name of Wheeler brought the parties together and was considered entitled to a part of the commission, but his conduct has no relation to the matters here involved.

On July 25th the plaintiff's attorney had written a letter to *Carrow.* In reply to this letter *Carrow* states the fact

in regard to the payment of the commission, expressed the dissatisfaction of himself and his associates with it, relates the financial difficulties in which the lessees found themselves, and explains why payments have not been made, and then says:

"We should judge from this offer that the impression has gained ground that it is owing to a lack of faith in the property rather than a lack of funds that we have allowed the taxes and other matters to go unpaid. This is absolutely not the case. . . . The reason these payments were not made was for lack of funds to meet them; neither have we any now."

In the closing paragraph of the letter *Carrow* says:

"While, of course, these particular things with which we have had to contend does not interest *Mr. Weinhagen,* it is simply in the way of explanation of the reason we have been unable to make these payments, and which puts us in a position at this time of not being able to consider *Mr. Weinhagen's* offer, as we know no way in which these funds can at present be raised."

This explanation of why they had not performed their contract cannot be construed into an election to waive the fraud and continue with the contract. There was some correspondence with *Hayes,* between *Hayes* and Harvey, in which *Hayes* referred to the commission, but we do not perceive what bearing this can have upon the question of an election by the lessees to waive the fraud of their agents.

There is evidence in the record tending to show also that they made efforts to dispose of the property. While of course this is a circumstance bearing upon the question of whether or not they intended to waive the fraud, standing by itself it is by no means conclusive. Smith, Fraud, § 136. Nothing further seems to have been done until after the commencement of this suit, which was begun November 25, 1916. After the commencement of the suit there were further efforts to find a purchaser, and Remeeus twice suggested prospective methods of financing the project.

The facts as to the conduct of *Hayes* and his associates after being fully apprised in reference to the fraudulent acts of their agents are practically undisputed. Whether or not their conduct constituted a waiver is therefore a question of law. *Fraser v. Ætna L. Ins. Co.* 114 Wis. 510, 90 N. W. 476. There is no claim that the conduct of the defendants created an estoppel *in pais.* The plaintiff did nothing in reliance upon their conduct or in any way changed his position in reference to the subject matter of the controversy.

The situation in which the defendants found themselves when they discovered the fraud of their agents had existed for nearly five years. They had incurred large obligations outside of and beyond the contract obligations arising out of the lease; they had expended considerable sums of money; and those upon whom they had relied had betrayed their confidence; and they no doubt were at a loss to know where to turn or what to do. Their effort to find a purchaser and inability to do so was probably a natural factor in their final decision. A rescission of the contract would not place them *in statu quo,* and their failure to act more promptly under such circumstances cannot be held to constitute a waiver of their right of rescission. They delayed from about the middle of July until November, and did nothing which showed any intent on their part either to waive the fraud or to rescind the contract, and unless they are barred by lapse of time, or unless their failure to act of itself amounts to a waiver, they had at the time the suit was begun the right of election. As was said in *Swedish American Nat. Bank v. Koebernick,* 136 Wis. 473, 479, 117 N. W. 1020:

"A waiver may be shown by a course of conduct signifying a purpose not to stand on a right, and leading, by a reasonable inference, to the conclusion that the right in question will not be insisted upon. And a person who does some positive act which, according to its natural import, is so inconsistent with the enforcement of the right in his favor as to induce a reasonable belief that such right has been dispensed with, will be deemed to have waived it."

In this case no situation arose subsequent to and before the commencement of this action which required the defendants to act, and they did nothing which indicated in any positive way that they had determined upon the one course or ·the other. An inference of intent to waive does not readily arise where the situation in which the party required to elect finds himself is the result of the opposite party's fraud or misconduct. *Ketchum v. Wells,* 19 Wis. 25; 40 Cyc. 259, par. 2, and cases cited.

There being no positive affirmative act indicating that the defendants intended to waive their right of rescission during the period which intervened between their receiving actual notice in July and the commencement of this action, we are of the opinion that mere delay under such circumstances did not amount to an election or an affirmance of the contract or a waiver of the right of rescission. While we recognize the distinction between waiver and estoppel *in pais* and that we are here considering mere waiver, nevertheless the fact that the parties stand in exactly the same situation now as they would have stood had the defendants made their election the next day after receiving full information is a matter worthy of consideration. No circumstances arose which required them to choose, and they did not choose. Mere delay did not amount to a waiver of their rights. *Ellis v. Southwestern L. Co.* 102 Wis. 400, 78 N. W. 747; *Knowlton v. Walker,* 13 Wis. 264; *Cedar Lake H. Co. v. Cedar Creek H. Co.* 79 Wis. 297, 48 N. W. 371; 2 Black, Rescission and Cancellation, § 546, and cases cited.

It is further contended that the matter was concluded in the receivership proceedings and is no longer open to investigation. We do not regard this contention as sound. The validity of the contract or the defendants' right of rescission was in no way drawn in question in that proceeding. In fact, the circumstances upon which the right of rescission is based were then unknown to the defendants.

The conclusion at which we have arrived makes it un-

necessary to consider the extent of the revivor of the action as against the estate of Eugene McFall. The principal contract having been rescinded, the obligation of the bondsmen, which in no way guaranteed the genuineness of the original contract, falls with it, and not only the lessees, but the parties to the bond, are discharged from further liability or obligation under its terms.

Our conclusion being that the lease should be canceled, it follows that the parties to the transaction should so far as possible be placed *in statu quo,* and to this relief the defendants are entitled under their counterclaim or cross-complaint. There should be an accounting between the parties, but in this accounting the plaintiff should not be chargeable with any losses, expense, or diminution of receipts due to the defaults, negligence, or mismanagement of the defendants.

Neither are the defendants entitled to have or receive, upon a rescission of the contract, any part of the amount paid by the plaintiff as commissions. Having elected to rescind the contract and to be placed *in statu quo,* they can certainly have no claim upon the money paid by the plaintiff.

As a condition of this relief the defendants are of course required to place the plaintiff *in statu quo* as to the property, and they should therefore release or procure a release of all rights as against the property which exist in, by, through, or under them.

*By the Court.*—The judgment is reversed, and the cause remanded for further proceedings according to law and in accordance with this opinion; the defendants to recover one bill of costs in this court.

The following opinion was filed August 5, 1920:

SIEBECKER, J. (*dissenting*). I cannot concur in the decision of the court. The record, in my opinion, sustains the trial court in its finding to the effect that the appellants,

after having knowledge of the payment by the plaintiff of a commission to the defendants Harvey and McClure and of their paying a part thereof to Clark C. Hyatt, continued to exercise acts of ownership of the property under the lease and elected to build and assert the interest of the lessee and retain the benefit thereof, and thereby waived their rights, if they had any, to have the lease or bond canceled.

I am authorized to say that Mr. Justice VINJE concurs in this dissent.

On November 16, 1920, a motion by the respondent for a rehearing was granted, and the cause was reargued on January 15, 1921.

The following opinion was filed May 31, 1921:

ROSENBERRY, J.    Mr. Chief Justice WINSLOW and Mr. Justice KERWIN took no part in the consideration of this case at the time it was submitted.  The opinion of the court was filed July 3, 1920, three of the Justices concurring in the decision and two dissenting.  A motion for a rehearing was made.  The motion was considered and a rehearing granted and the cause was again fully argued before the court, all Justices sitting.  Before the matter was considered in conference Mr. Justice KERWIN died.  When the case was taken up the court was equally divided upon the questions involved.  The case being an important one by reason of the amount and legal principles involved, further consideration was postponed until such time as the vacancy created by the death of Mr. Justice KERWIN should be filled.  Upon the appointment of Mr. Justice DOERFLER the entire matter was again reconsidered by the whole court.  Upon such reconsideration the court is of the opinion that the conclusion reached and announced in the opinion filed should not be disturbed, largely for the reasons therein stated.  The situ-

ation is such, however, that we deem it advisable to state briefly the grounds upon which our final conclusion rests.

Upon the rehearing two principal questions were considered. First, whether the plaintiff was chargeable with the knowledge which his agent, Schenck, had as to the material facts in relation to the negotiations and the parties thereto; and second, whether the twelfth finding made by the trial court was sustained by the evidence, and, if so, whether or not the subsequent conduct of the lessees amounted to a waiver of their right of rescission.

In connection with the first proposition some criticism is made of a statement contained in the opinion that "It taxes human credulity to believe that under such circumstances Schenck [the agent] did not know that McClure and Harvey represented the proposed lessee." We have again examined the testimony of Mr. Schenck upon this point, and while it does not appear that he knew the names of those who subsequently became the lessees, he must have known, or at least is chargeable as a matter of law with knowledge of the fact, that they represented an undisclosed principal, for at no time did they pretend that they were negotiating in their own behalf. They must have been negotiating in behalf of some principal, and it may be, as contended, that Mr. Schenck did not have knowledge of the fact that the present lessees were the principals; but he is chargeable, as a matter of law, with knowledge of the fact that they were representing a third party. It is further contended that Schenck's agency was of a very limited scope. In his reply to the cross-complaint the plaintiff alleged:

"That there was in the employ of this plaintiff a real-estate agent by the name of Otto J. Schenck, to generally look after said real estate, collect the rents therefrom, taking care of the same for this plaintiff, and that this plaintiff let it be known to the said Otto J. Schenck that he would entertain a proposition to lease said real estate upon long-term

lease, provided suitable and responsible parties could be found who would be willing to lease the same, and at such rental as this plaintiff would be willing to accept as a condition of entering into said lease."

Plaintiff further alleged that:

"Accordingly, during the summer of 1911, certain persons, who were unknown to this plaintiff, approached the said Otto J. Schenck, who was at that time acting as the agent for this plaintiff, and informed the said Otto J. Schenck, as this plaintiff is informed and believes, that they, the said persons at that time unknown to this plaintiff, had a person who was ready and willing to lease said real estate so owned by the said plaintiff. . . . That this plaintiff did not personally conduct any of the negotiations with either of said persons, but that said negotiations were carried on by the said Otto J. Schenck as his agent, and that neither this plaintiff nor the said Otto J. Schenck had any knowledge or information until shortly prior to the execution of said lease that the said defendant *H. J. Hayes* was the person who was to become the lessee."

These allegations of the plaintiff's reply have not been withdrawn or modified, and the court is unanimously of the opinion that these allegations, taken in connection with the facts and circumstances shown by the evidence, conclusively establish that Schenck was the agent of the plaintiff, empowered to negotiate in respect to the terms of the lease, and furthermore, that Schenck had knowledge of the fact that the persons (Harvey and McClure) who approached him were representing third parties, and that the plaintiff is therefore chargeable with knowledge of the facts which came to the attention of his agent, Schenck, in the course of the negotiations.

By the finding of fact numbered 12 the trial court found:

"That after having knowledge (before the commencement of this action) of the payment by the plaintiff of the moneys aforesaid to the defendants Harvey and McClure, and of the payment by said Harvey and McClure of a part

thereof to said Clark C. Hyatt, the defendants *H. J. Hayes, H. P. Carrow, Guy H. McFall,* and R. A. Bartholomew continued to exercise acts of ownership of said premises under and by virtue of the lease and elected to hold and assert the interest of the lessee therein, and have by their conduct since obtaining such knowledge waived their rights, if any they ever had, to have said lease or bond canceled, and have elected to retain said lease and the benefits thereof."

In consideration of the question whether this finding is sustained by the evidence, the court has given full effect to the established rule that a finding of the trial court upon questions of fact will not be reversed unless it is against the clear preponderance or great weight of the evidence. It is conceded on both sides that on or about July 28, 1916, the lessees were fully informed in regard to the payment of a commission to their agents, Harvey, McClure, and Hyatt. The finding of the trial court to the effect that they had knowledge of such payment before the commencement of the action is therefore sustained. The question then arises whether or not they had knowledge of the payment of a commission to their agents prior to that time. It is claimed by the plaintiff that such knowledge was brought home to the lessees in October, 1911, and again late in 1913 or early in 1914. As pointed out in the original opinion, the finding of the court as to the time when knowledge was brought home to the plaintiff is a general finding, being to the effect that it was some time prior to the commencement of the suit. Such a finding may well rest wholly upon the undisputed fact that they had such knowledge in July, 1916. Whether or not they had such knowledge prior to that time, as now contended by the plaintiff, can only be ascertained by an examination of the evidence, unaided by any finding of the trial court in that respect. We have again carefully reviewed the evidence, and the court is of the opinion that it clearly preponderates against plaintiff's contentions. If

Weinhagen v. Hayes, 174 Wis. 233.

the testimony be given its full weight, the facts brought to the attention of the lessees were not sufficient to arouse a suspicion in the minds of the lessees, who had fully trusted Harvey, McClure, and Hyatt, who were not only their agents but their personal friends, in the negotiations of an important business deal. Considered in connection with all the evidence, the testimony relied upon by plaintiff is highly improbable and not at all convincing. It was not sufficient to put the lessees upon inquiry and was wholly lacking in that definiteness necessary to charge them with knowledge of the essential facts.

There remains then the question, Did the lessees by their conduct after July, 1916, elect to retain the lease and the benefits thereof? The facts being undisputed, the question of whether their conduct after that date amounted to an election is a question of law. The real question is whether or not, under the established facts, in the exercise of a sound discretion, a court of equity should grant relief to the lessees who were admittedly the victims of an insidious fraud. For the reasons stated in the original opinion, the court considers that such relief should be granted. The original mandate is approved.

SIEBECKER, C. J., and VINJE and JONES, JJ., dissent.

On July 13, 1921, the following order was entered by the court:

The motion herein on behalf of the respondent, filed June 8, 1921, while in terms a motion to modify the mandate, is in fact and substance a motion for a rehearing of a decision made on rehearing and cannot therefore be entertained. The motion papers are stricken from the files and the clerk is directed to remit the record forthwith.