Jeff THOMPSON, Plaintiff-Respondent and Cross-Appellant,

v.

VILLAGE OF HALES CORNERS, a municipal corporation, Defendant-Appellant and Cross-Respondent,

WALTER NOWICKI, INC., a Wisconsin corporation, Defendant and Cross-Respondent.

Supreme Court

*No. 82–488. Argued September 8, 1983.—Decided November 30, 1983.*

(Also reported in 340 N.W.2d 704.)

290

For the defendant-appellant and cross-respondent there were briefs by *David J. Schoetz,* Milwaukee, and and oral argument by *Mr. Schoetz.*

For the plaintiff-respondent and cross-appellant there were briefs by *Mark J. Rogers,* Milwaukee, and oral argument by *Mr. Rogers.*

DAY, J.   This is an appeal from a judgment of the Milwaukee County Circuit Court, Honorable Michael T. Sullivan, Reserve Judge, presiding, awarding damages and attorney's fees to the plaintiff, Jeff Thompson (Thompson), against the Village of Hales Corners (Village) for violation of his civil rights under sec. 1983 of Title 42 of the United States Code.  The court also awarded damages to defendant Walter Nowicki, Inc. (Nowicki) against Thompson in its counterclaim for unpaid rents.  This court accepted the case on certification from the court of appeals pursuant to sec. 809.61, Stats. 1981–82.  The two principal questions raised on

appeal are: (1) whether the state may limit the amount a claimant may recover against a municipality in a sec. 1983 civil rights action, and (2) whether the trial court applied the correct standards in awarding attorney's fees under 42 U.S.C. sec. 1988. We conclude that a state statutory recovery ceiling on damages awards against governmental bodies is inapplicable in sec. 1983 suits, and that the attorney's fees of $23,180.80 were reasonable and should not have been reduced by the trial court. Other issues raised by the parties will be dealt with in the balance of this opinion.

In the fall of 1977, Thompson began investigating the possibility of opening a combination sandwich shop and amusement arcade in the Hales Corners area. In January of 1978, he reached an agreement with a representative of Nowicki on the terms of a lease in the Postal Plaza Shopping Center and began making improvements in anticipation of opening sometime in the spring. The shop, known as "Pinnochios," opened on May 1, 1978. It consisted of one room where food was served and a second smaller room that contained from eight to twelve coin operated amusement devices—pinball machines, pool tables and electronic video games. Though Pinnochios' clientele included people of all ages, the restaurant was directed toward and attracted a large number of young people.

Pinnochios did its best business during the first months of operation. Sales fell off sharply in the late summer and into the fall. On December 23, 1978, Mr. Thompson closed Pinnochios.

Throughout 1978 and at all other times relevant to this lawsuit, the Village had an ordinance forbidding minors to play coin operated amusement devices unless accompanied by a parent or adult guardian.[1] Thompson

---

[1] "11.06 *AMUSEMENT DEVICES.* . . . (7) ADDITIONAL REGULATIONS. . . . (d) No licensee shall suffer or permit any

testified that he was first made aware of this rule in March of 1978, when a member of the Hales Corners Police Department delivered a copy of the ordinance to him. A few days later, Thompson met with the chief of police who told him that the ordinance would be enforced and might even prevent the business from opening. In April, Thompson unsuccessfully attempted to have the ordinance changed and was again informed, this time by the village attorney, that the law would be enforced.

Thompson testified that he made an effort to comply with the law. He posted a sign in the game room, checked patrons' identification cards, and refused to allow several known minors to play the games.

On May 12, the village commissioner sent Thompson a letter which noted his failure to license some of his games and warned against violations of sec. 11.06. There was testimony that police presence in and around Pinnochios increased over the course of the operation of the business. On May 14, an officer for the village police department observed minors playing games and reported the violation to Pinnochios' manager. Policemen entered the premises on a number of occasions to check identification cards of patrons in the game room.

Police patrols outside Pinnochios also increased. One employee testified to observing as many as three to five police cars per hour. Others reported seeing police cars two or three times an hour. One witness reported seeing policemen in parked cars watching what was going on inside the restaurant with binoculars.

minor under the age of 18 years to operate an amusement device unless said minor is accompanied by his or her parent, guardian or spouse of whom one shall be 18 years of age, nor shall any license hereunder be issued to any owner who permits minors to loiter on his premises."

There was never any completed formal prosecution for violations of sec. 11.06 at Pinnochios. The police did issue "Police Department Referral Memos" to two employees and a summons and complaint to Thompson for violation of the ordinance during a Halloween party in late October.

There was testimony that the police presence made customers uneasy and caused some to leave or stay away. Mr. Thompson claimed that as the police presence increased, business declined. By December, the operation was no longer profitable and was closed.

On November 15, 1978, Thompson filed suit in the Milwaukee County Circuit Court. His complaint alleged four separate causes of action. The first was for tortious misrepresentation. Thompson alleged that both the village and Nowicki falsely represented that there were no legal impediments to operating the business. The second claim, for negligence, was dismissed on motion of the plaintiff before trial. The third claim sought rescission of the lease with Nowicki on the grounds of mutual mistake of fact, and the fourth was for violation of Thompson's civil rights under 42 U.S.C. sec. 1983. The sec. 1983 claim charged that the Village had selectively enforced its ordinance number 11.06 to Thompson's injury. Nowicki counterclaimed against Thompson for unpaid rents.

The matter was tried before a jury in October of 1981 which found in favor of the Village and Nowicki on the misrepresentation claim. A verdict for Thompson on the mutual mistake claim was overturned by the trial court. On the civil rights claim, the jury found for Thompson and awarded $88,000 in damages consisting of $38,000 for capital and operational losses and $50,000 for lost profits. The court also made a finding and award of attorney's fees as authorized by federal law. The jury found for Nowicki in its counterclaim and the court

entered judgment for $2,852 against Thompson for unpaid rents. Both the Village and Thompson raise a number of issues on appeal.

The first issue concerns the enforceability of an $88,000 damage award against a municipality in a sec. 1983 action. The Village contends that its maximum exposure in any tort action, including a sec. 1983 claim, is limited by sec. 893.80(3), Stats. 1979–80[2] at $25,000. Thompson, while not challenging the general validity of the statute, argues that the Supremacy Clause of the United States Constitution forbids the state to limit recovery on a civil rights claim under sec. 1983.

Article VI, clause 2 of the United States Constitution provides: "[T]his constitution, and the Laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land." The United States Supreme Court has interpreted the Supremacy Clause to require that "any state law, however clearly within a state's acknowledged power, which interferes with or is contrary to federal law, must yield." *Free v. Bland*, 369 U.S. 663, 666 (1962); *Gibbons v. Ogden*, 22 U.S. 1, 210–211 (1824). In considering the validity of a state act under the Supremacy Clause, the question is whether the challenged statute "stands as an obstacle

---

[2] "893.80 Claims against governmental bodies or officers, agents or employees; notice of injury; limitation of damages and suits. . . .

"(3) The amount recoverable by any person for any damages, injuries or death in any action founded on tort against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or agency thereof and against their officers, officials, agents or employees for acts done in their official capacity or in the course of their agency or employment whether proceeded against jointly or severally, shall not exceed $25,000. No punitive damages may be allowed or recoverable in any such action."

The recovery limit was raised to $50,000 by ch. 63, Laws of 1981.

to the accomplishment and execution of the full purposes and objectives of Congress," *Perez v. Campbell,* 402 U.S. 637, 649 (1970) or results in "frustration and erosion of the congressional policy embodied in federal rights." *Ridgway v. Ridgway,* 454 U.S. 46, 54 (1981). Furthermore, "[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law. . . ." *Free v. Bland,* 369 U.S. at 666. In determining the validity of the state recovery limit we must first inquire into the purposes underlying sec. 1983 and then determine whether giving effect to the state statute would frustrate those purposes.

Title 42 U.S.C. sec. 1983 enacted as sec. 1 of the Civil Rights Act of 1871 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

United States Supreme Court cases construing sec. 1983 have identified two principal purposes behind the statute: to create a species of tort liability in favor of persons deprived of constitutional rights and to deter governmental authorities from future constitutional violations. *Robertson v. Wegmann,* 436 U.S. 584, 590–591 (1978).

The United States Supreme Court made an analysis of tort liability under sec. 1983 in the case of *Carey v. Piphus,* 435 U.S. 247 (1978). That case involved a suit by public school students against school officials because they had been suspended from school without due process of law. The question before the Court was

whether the students' recovery under the federal statute should be governed by traditional tort damages doctrines or whether they should be permitted to recover damages without any showing of actual injury. The Court held that the guiding principle in sec. 1983 damage awards is compensation. "[T]he basic purpose of a sec. 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights. . . ." 435 U.S. at 254.

The United States Supreme Court noted that state common law damages rules may not provide a suitable model for sec. 1983 actions in every case. When they do not, "the task will be . . . one of adapting common-law rules of damages to provide fair compensation for injuries caused by the deprivation of a constitutional right." *Carey,* 435 U.S. at 258. Thus in determining damages under sec. 1983, resort will be had to state law insofar as it is compatible with the purposes of the federal rule. But state law will not be used when its application would frustrate the purposes of federal law. "The purpose of sec. 1983 would be defeated if injuries caused by the deprivation of constitutional rights went uncompensated simply because the common law does not recognize an analogous cause of action." *Carey,* 435 U.S. at 258. We conclude that the purpose behind sec. 1983 would be similarly defeated if deprivation of constitutional rights was not fully compensated because of a state statutory recovery ceiling.

The Village emphasizes that the defendant in this action is a municipal corporation. Although the United States Supreme Court made it clear in *Monell v. New York City Dept. of Social Services,* 436 U.S. 658 (1978) that municipalities do not enjoy an absolute immunity from suit under sec. 1983, the Court expressly deferred

decision on whether municipalities could claim any qualified immunities.  436 U.S. at 701.

The Supreme Court had occasion to consider the question of qualified immunities in *Owen v. City of Independence, Missouri,* 445 U.S. 622 (1980).  In that case, the City of Independence asserted as a defense to a suit under sec. 1983 the good faith of the city officials involved.  In holding that the city could not claim good faith as a defense, the Court set down the following general guidelines for considering immunity questions. "Where the immunity claimed by the defendant was well established at common law at the time sec. 1983 was enacted, and where its rationale was compatible with the purposes of the Civil Rights Act, we have construed the statute to incorporate that immunity." 445 U.S. at 638.  The Court concluded "that neither history nor policy supports a construction of sec. 1983 that would justify the qualified immunity accorded the City of Independence by the Court of Appeals." 445 U.S. at 638.

The United States Supreme Court applied the guidelines set forth in *Owen* but found a qualified immunity in the case of *Newport v. Fact Concerts, Inc.,* 453 U.S. 247 (1981) where the city claimed immunity from punitive damages in sec. 1983 actions.  Noting first that at the time the Civil Rights Act of 1871 was passed, common law courts consistently refused to allow punitive damages against municipalities, and second, that public policy considerations do not favor allowing punitive damages against cities, the Court recognized that particular qualified immunity.  The Court reiterated that the principal purposes of sec. 1983 are compensation and deterrence.  Allowing punitive damages does nothing to advance the first purpose and its usefulness in deterring individuals from future violations is, in the Court's words, "uncertain." 453 U.S. at 269.  The Court further

stated that permitting large punitive damage awards could conceivably threaten local treasuries.[3]

Applying the analysis used by the Supreme Court in *Owen* to the present case we conclude that limiting liability is not permitted. It is true that at the time the Civil Rights Act of 1871 was passed, municipal corporations were afforded protection from tort liability under two different doctrines. The first distinguished between a municipality's "governmental" and "proprietary" functions. When a municipality was performing governmental functions, it was immune. When performing proprietary functions, it was held to the same standards of liability as any private corporation. The second doctrine immunized a municipality for "discretionary" or

---

[3] The Village urges the threat to the public treasury as grounds for upholding the state imposed recovery limit. We note, however, that the Supreme Court in *Newport*, while rejecting punitive damages, stated that it was proper for taxpayers to bear the burden of compensatory damages. 453 U.S. at 270. The Court had previously expressed the same sentiment when it stated in *Owen:*

"It hardly seems unjust to require a municipal defendant which has violated a citizen's constitutional rights to compensate him for the injury suffered thereby. Indeed, Congress enacted sec. 1983 precisely to provide a remedy for such abuses of official power. See *Monroe v. Pape*, 365 U.S. at 171–172. Elemental notions of fairness dictate that one who causes a loss should bear the loss.

"It has been argued, however, that revenue raised by taxation for public use should not be diverted to the benefit of a single or discrete group of taxpayers, particularly where the municipality has at all times acted in good faith. On the contrary, the accepted view is that stated in *Thayer v. Boston*—'that the city, in its corporate capacity, should be liable to make good the damage sustained by an [unlucky] individual, in consequence of the acts thus done.' 36 Mass. at 515. After all, it is the public at large which enjoys the benefits of the government's activities, and it is the public at large which is ultimately responsible for its administration." 445 U.S. at 654–655.

"legislative" activities, but not for those which were "ministerial" in nature.

The United States Supreme Court held in *Owen* that while both grounds for immunity were recognized at the time the Civil Rights Act of 1871 was passed, neither could serve as a basis for immunity under sec. 1983. In *Owen*, the Supreme Court noted that the governmental-proprietary distinction is rooted in the dual nature of the municipal corporation. "On the one hand, the municipality was a corporate body, capable of performing the same 'proprietary' functions as any private corporation, and liable for its torts in the same manner and to the same extent, as well. On the other hand, the municipality was an arm of the State, and when acting in that 'governmental' or 'public' capacity, it shared the immunity traditionally accorded the sovereign." 445 U.S. at 644–645. But the principle of sovereign immunity is nullified when the state expressly or impliedly allows itself, or its creation, to be sued. "[T]he municipality's 'governmental' immunity is obviously abrogated by the sovereign's enactment of a statute making it amenable to suit. Section 1983 was just such a statute. By including municipalities within the class of 'persons' subject to liability for violations of the Federal Constitution and laws, Congress—the supreme sovereign on matters of federal law—abolished whatever vestige of the State's sovereign immunity the municipality possessed." 445 U.S. at 647–648.

The Supreme Court also explained why the rationale underlying the common law immunity for "discretionary" functions cannot serve as the foundation for immunity under sec. 1983. The municipality's common law immunity from suits challenging "discretionary" decisions is grounded on the principle of separation of powers. "That common law doctrine merely prevented courts from substituting their own judgment on matters within

the lawful discretion of the municipality. But a municipality has no 'discretion' to violate the Federal Constitution; its dictates are absolute and imperative. And when a court passes judgment on the municipality's conduct in a sec. 1983 action, it does not seek to second-guess the reasonableness of the city's decision nor to interfere with the local government's resolution of competing policy considerations." 445 U.S. at 649.

If the common law immunities discussed above could not have been the basis for municipal immunity under sec. 1983 at the time the Civil Rights Act was passed, it follows *a fortiori* that sec. 893.80(3), Stats. could not. The legislature's act placing a dollar limit on municipal liability was passed in 1963[4] subsequent to this court's decision in *Holytz v. Milwaukee*, 17 Wis. 2d 26, 115 N.W.2d 618 (1962), abrogating common law municipal tort immunity. It is evident therefore, that the qualified immunity urged by the Village in this case was not "well established at common law at the time sec. 1983 was enacted." *Owen*, 445 U.S. at 638.

Section 893.80(3), Stats. also fails the second prong of the test stated in *Owen* for finding a qualified immunity. To permit states to limit the liability of municipalities in sec. 1983 actions inhibits one of the purposes of the section which is fair compensation for constitutional torts.

The Village directs our attention to 42 U.S.C. sec. 1988[5] and federal case law interpreting that section.

---

[4] Chapter 198, Laws of 1963.

[5] "Sec. 1988. *Proceedings in vindication of civil rights.* The jurisdiction in civil and criminal matters conferred on the district courts by the provision of this Title, and of Title 'CIVIL RIGHTS,' and of Title 'CRIMES,' for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable

The Village argues that *Robertson v. Wegmann*, 436 U.S. 584 (1978) holds that the question of damages in a sec. 1983 action should be answered from state law.

Section 1988 directs the courts to look first to federal law in enforcing provisions of the Civil Rights Act. When federal law is either not adapted to the object or is deficient in its provisions, the court is to turn to state law. The court shall implement only those state law rules which are "not inconsistent with the constitution and laws of the United States."

In this case there is clearly articulated federal case law regarding damages and therefore no necessity of resorting to state law. As noted above, the United States Supreme Court held in *Carey* that damages in sec. 1983 suits are to provide fair compensation for actual injuries.

Even if there were no federal law of damages for sec. 1983 actions, the limitation imposed by sec. 893.80(3), Stats. could not be given effect. As noted in *Robertson*, 42 U.S.C. sec. 1988 recognizes that in certain cases federal law is either unsuited or insufficient to furnish federal remedies. When federal law is thus deficient, sec. 1988 directs the court to look to "the common law, as modified and changed by the constitution and statutes of the state," so long as the state law is "not inconsistent with the Constitution and laws of the United States." *Robertson*, 436 U.S. at 588. The Court in *Robertson* went on to say that "[i]n resolving questions of incon-

---

to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty. . . ."

sistency . . . courts must look not only at particular federal statutes and constitutional provisions, but also at 'the policies expressed in [them].' Of particular importance is whether application of state law 'would be inconsistent with the federal policy underlying the cause of action under consideration.' " 436 U.S. at 590 (citations omitted).

State law cannot be used where its application would frustrate federal policies. The policy behind sec. 1983 civil rights actions is one of compensation for actual injury. Insofar as the state recovery ceiling prevents realization of that policy, it must give way. We conclude that the limitation on municipal liability set forth in sec. 893.80, Stats. has no application to a damage award under 42 U.S.C. sec. 1983. We therefore affirm the trial court's judgment awarding the plaintiff $88,000 in damages.

The second question is attorney's fees. Title 42 U.S.C. sec. 1988 provides that in federal civil rights actions "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." Under authority of that section, the trial court determined that a reasonable fee for legal services provided by Thompson's counsel in prosecuting this action was $23,180.80. However, the court awarded only one-half that amount or $11,500 on the grounds that the case had been taken on a contingent fee basis and because Thompson represented no group or class. Both the Village and Thompson appeal. The Village contests the reasonableness of the court's findings and Thompson contests the reduction of the award.

The provision of sec. 1988 concerning attorney's fees was enacted by the 94th Congress as the Civil Rights Attorney's Fees Award Act of 1976. The Act was a

direct response to the United States Supreme Court decision in *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240 (1975) which disapproved a line of lower federal court decisions awarding attorney's fees under the "private attorney general" doctrine. (S. Rep. 1011, 94th Cong., 2nd Sess. 1, *reprinted in* 1976 U.S. Code Cong. & Ad. News, 5908, 5909). In authorizing the fee shifting, Congress determined that "[i]f private citizens are to be able to assert their civil rights and if those who violate the Nation's fundamental law are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court." (S. Rep. No. 1011, 94th Cong., 2nd Sess. 2, *reprinted in* 1976 U.S. Code Cong. & Ad. News, 5908, 5910).

The determination of what is a reasonable fee under sec. 1988 is left to the discretion of the trial court. *Hensley v. Eckerhart,* —— U.S. ——, 103 S. Ct. 1933, 1941 (1983). Ordinarily a trial court's award will be reversed on review only if the court abused its discretion. In a recent civil rights attorney fees awards case the Seventh Circuit said: "Error of law, however, is also a ground for reversing what would ordinarily be a discretionary ruling. If a judge erroneously thought the law required him to do what he did, the judge did not exercise discretion." *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 765 (7th Cir. 1982). *See also, Schmid v. Olsen,* 111 Wis. 2d 228, 236, 330 N.W.2d 547 (1983).

In its calculation of what it deemed a reasonable fee, the trial court adopted the formula suggested by the Third Circuit in *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3rd Cir. 1973). Under the *Lindy Bros.* approach, the court begins by computing the number of hours devoted to the case by each attorney and then multiplying that figure by a reasonable hourly

rate. This calculation yields a base rate which may be adjusted based on two factors: a contingency factor, i.e., the court's assessment of the likelihood of success, and a quality factor. The *Lindy Bros.* court said that the contingency factor "is of special significance where . . . the attorney has no private agreement that guarantees payment even if no recovery is obtained." 487 F.2d at 168.

In applying the *Lindy Bros.* rules to this case, the trial court began by calculating a basic fee for each of the three attorneys for the plaintiff by multiplying the number of hours spent on the case by an hourly rate appropriate to the skill and experience of the particular attorney. The basic fee for Attorney Rogers was then enhanced by a factor of fifty percent based on the court's evaluation of the contingency factor. It justified the increase on three grounds: "(i) His compensation was contingent on recovery; (ii) Difficulty of proving [the] case; (iii) Preclusion of other employment in the relatively brief time (one year, nearly 200 hours of work) from employment to the time of trial." The fee was further enhanced by a factor of thirty percent based on the quality of Rogers work. The court felt this increase was warranted because of "(i) Reputation, experience and background of Rogers; (ii) Result obtained; (iii) Preparation of jury instructions relied on by the court to a substantial extent." The court made no enhancement of the basic fee of the other two attorneys. Based on these calculations, the court found that a reasonable attorneys' fee was $23,180.80.

The Village attacks the reasonableness of this finding on a number of grounds. First, it contends that it was error for the court to make its determination based on criteria used in the Third Circuit rather than the standards used in the Seventh Circuit. The argument rests on the assumption that the pronouncements of the sev-

enth circuit on matters of federal law carry more weight in Wisconsin state courts than the decisions of other circuits. In an early but still adhered to statement on the precedential value of lower federal court rules in Wisconsin state courts, this court said:

"Of course the construction of the bankruptcy act finally rests with the federal courts and at last with the supreme court of the United States. If there were no difference of opinion among those courts, or indeed if the supreme court had finally spoken on that subject, we should of course be guided by such utterance. But where variant views are entertained it is the duty of this court to decide for itself." *Stuart v. Farmer's Bank of Cuba City*, 137 Wis. 66, 75, 117 N.W. 820 (1908).

Likewise, the Seventh Circuit denied that its decisions were binding on state courts in Wisconsin or anywhere else. In *United States ex rel. Lawrence v. Woods*, 432 F. 2d 1072, 1075–1076 (7th Cir. 1970), that court said:

"The Supreme Court of the United States has appellate jurisdiction over federal questions arising either in state or federal proceedings, and by reason of the supremacy clause the decisions of that court on national law have binding effect on all lower courts whether state or federal. On the other hand, because lower federal courts exercise no appellate jurisdiction over state tribunals, decisions of lower federal courts are not conclusive on state courts."

The Supreme Court discussed the question of awarding attorney's fees under sec. 1988 in the recent case of *Hensley v. Eckerhart*, —— U.S. ——, 103 S. Ct. 1933 (1983). The specific question before the Court in that case was whether time spent in prosecuting an unsuccessful claim should be included in calculating a reasonable fee. However, the Court approved a method of calculating fees in which the basic fee of hours times rate is ad-

justed up or down according to twelve factors listed in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir. 1974). Those twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Hensley,* 103 S. Ct. at 1937, n. 3; *Johnson,* 488 F.2d at 717–719. The six grounds stated by the trial court in justification of its enhancement of Attorney Rogers fee are all among the factors identified by the United States Supreme Court as legitimate considerations in enhancing a fee award. Therefore, we conclude that this method would not necessarily yield a different result from that arrived at by the trial court.

The Village advances a number of other grounds for finding $23,180.80 unreasonable. It argues that the court should have used a different hourly rate for "in court" and "out of court" time, and that it was improper to allow compensation for time spent preparing materials on the attorneys' fees issue. We disagree with both contentions. Although there is authority for compensating the various tasks attorneys perform at different hourly rates,[6] "[m]ost courts . . . continue to apply to lawyers

---

[6] It is true, as the Village points out, that under the Wisconsin Supreme Court Rules, attorneys appointed by a court to provide legal services for that court are paid at a different rate for in court and out of court time. Sup. Ct. R. 81.02 (1980). How-

the same rates—varied only by the lawyers' experience —for all service provided whatever their nature." E. Richard Larson, *Federal Court Awards of Attorney's Fees,* 212 (1981). Likewise, in *Bond v. Stanton,* 630 F.2d 1231, 1235 (7th Cir. 1980), a sec. 1983 action, the Seventh Circuit Court of Appeals said: "a prevailing plaintiff's entitlement to fees for the effort entailed in securing compensation has been unanimously upheld [by those courts that have addressed the issue]."

In conclusion, we hold that the trial court did not abuse its discretion in finding attorneys' fees reasonable at $23,180.80.

After having made its determination that $23,180.80 was reasonable compensation for legal services performed on behalf of Thompson, the trial court decided to assess only one-half that amount against the Village and require that the balance be made up from the damages award. In support of its decision, the court cited *Harris v. Harvey,* 453 F. Supp. 886 (E.D. Wis. 1978) and stated that it was reducing the award "because plaintiff represented no class or group." Thompson in his cross appeal challenges this reduction.

What is the essential policy underlying an award of attorney's fees under sec. 1988? The *Harris* case relied on by the trial court is part of a line of federal cases agreeing with the reasoning in *Zarcone v. Perry,* 581 F.2d 1039 (2nd Cir. 1978). In that case, a damage suit against a judge who had handcuffed and berated the plaintiff coffee vendor for the quality of his coffee, the trial court had refused to award any attorney's fees. The trial court said that the suit was basically a tort action which vindicated the public interest in only an at-

---

ever, that rule applies to court appointed attorneys. The award of attorney's fees in this case is pursuant to a federal statute and we therefore look to federal law for the standards governing the award.

tenuated way. *Zarcone v. Perry*, 438 F. Supp. 788, 790 (E.D. N.Y. 1977). The second circuit said on appeal that the district court erred insofar as it held that fees may be awarded under sec. 1988 only in cases conferring benefits on the public at large through injunctive or class relief. However, the circuit court upheld the trial court's denial of fees on the grounds that there were sufficiently "bright prospects" of a damages award to attract counsel without the incentive of an attorney's fees award by the court. The court noted a number of considerations to be weighed in a court's decision on fee shifting but stated "the principal factor to be considered by the trial judge in exercising his discretion is whether a person in the plaintiff's position would have been deterred or inhibited from seeking to enforce civil rights without an assurance that his attorneys' fees would be paid if he were successful." 581 F.2d at 1044.

The First Circuit came to a different conclusion in *Sargeant v. Sharp*, 579 F.2d 645 (1st Cir. 1978). There the court noted that the case under consideration was "atypical of civil rights actions" in that it had been brought on a contingent fee basis. 579 F.2d at 648. However, the court said that "the economic factors relevant to the decision as to whether fee shifting . . . would be unjust" must be considered in light of Congress' intent "to encourage the private enforcement of civil rights laws in order to fully vindicate the federal laws involved." 579 F.2d at 648. The court concluded:

"[W]e reiterate that a fee agreement is irrelevant to the issue of entitlement and should not enter into the determination of the amount of a reasonable fee. A private fee arrangement is not in itself 'special circumstances which would render an award unjust,' and unless the court finds such circumstances, it may not deny fees in this case. If the court sets the fee amount and determines that counsel has already received remuneration equal to or above that amount and that the award

will not go to compensate the plaintiff, it would be an abuse of its discretion to deny the award of fees solely on that basis. Such a decision would be undesirable as a 'windfall' to the defendants, a frustration of the congressional policy of encouraging the private enforcement of civil rights actions, and perhaps an unwarranted interference with a voluntary attorney-client fee agreement which is not in itself excessive. The better route would be to order that the award reimburse the plaintiff, with any excess over the amount set by the fee agreement going to her counsel." 579 F.2d at 649.

The Tenth Circuit considered the effect of a contingent fee agreement on the award of attorney's fees under sec. 1988 in the recent case of *Cooper v. Singer II,* Nos. 81–2015, 81–2113, slip op. (10th Cir. Oct. 24, 1983). In that case, the court reconsidered *en banc* an earlier panel decision holding that while the existence of a contingent fee agreement did not foreclose the possibility of an attorney's fee award under sec. 1988, the contingent fee agreement should set the upper limit on the amount of the fee award. *Cooper v. Singer,* 689 F.2d 929 (10th Cir. 1982). On rehearing in light of the United States Supreme Court decision in *Hensley v. Eckerhart,* the court stated:

"*Hensley* provides an efficient and analytically sound approach to section 1988 attorney's fee awards. The opinion contains no suggestion that a different approach should be followed in cases where the prevailing party and his attorney have executed a contingent fee agreement. Indeed, we believe that the goals of section 1988 are advanced by following the framework set forth in *Hensley,* regardless of the fee arrangements made by the attorney and his client." *Cooper v. Singer II,* 719 F2d at 1501.

The court specifically rejected the "bright prospects" rule of *Zarcone* noting that it finds no support in the legislative history of sec. 1988 and that it ignores two

of the purposes of a sec. 1988 fee award—"penalizing obstructive litigation by civil rights defendants and generally deterring civil rights violations." At 1501. The court also reversed its previous holding that a contingent fee agreement sets an upper limit on fee awards under sec. 1988. The limit was adopted to prevent excessive awards. The court determined that the limitation was not necessary because "[f]ee awards properly calculated under *Hensley* . . . are not excessive within the meaning of sec. 1988; they represent the reasonable worth of the attorney's services." At 1502. Furthermore, calculating attorney's fees under the guidelines approved in *Hensley* advances the general intendment of sec. 1988 of providing incentives for meritorious civil rights litigation.

"It instructs a lawyer to critically evaluate the prospects for success in each potential civil rights claim, and it encourages the lawyer to proceed only with those claims that are indeed meritorious. The lawyer can go forward with difficult arguments, confident that the client's fee award will reflect the obstacles that the attorney overcomes. The lawyer can go forward with non-monetary claims, secure in the knowledge that the fee award will not be diminished on account of the absence of damages." Slip op. at 14.

█
Our reading of the legislative history of sec. 1988 and the United States Supreme Court's decision in *Hensley v. Eckerhart* persuades us that the decisions of the First and Tenth Circuits are more in keeping with Congressional purposes than the decisions relied on by the trial court. We therefore disapprove the reduction of fees based on the existence of a contingent fee arrangement.

█
We also conclude that the individual nature of the suit is not grounds for reducing the award. In legislating to

change the future effect of the Supreme Court's decision in *Alyeska,* Congress did not authorize fee shifting in all cases where the private attorney general theory had been used but only in cases asserting civil rights violations. We conclude, therefore, that it was not so much the number of persons affected as the importance of the substantive rights implicated that Congress was concerned with. On that basis we conclude that the trial court erred in reducing the attorney's fees award against the Village on the grounds that the suit was brought by an individual rather than a class. The full fee of $23,-180.80 the trial court found to be reasonable should have been assessed against the Village.[7]

The Village next challenges the sufficiency of the evidence in support of the jury's verdict. At the outset, we reiterate the scope of our review. The jury's verdict will not be upset on appeal if there is any credible evi-

[7] After oral argument was completed, the Village applied for and was granted leave to raise and brief a question not addressed in the original briefs or at oral argument. The Village argues that attorney's fees are not recoverable under sec. 1988 when a sec. 1983 action is brought in a state court. The argument is without merit. That precise question was addressed by the United States Supreme Court in the case of *Maine v. Thiboutot,* 448 U.S. 1 (1980) wherein it was stated:

"Several States, participating as *amici curiae,* argue that even if sec. 1988 applied to sec. 1983 claims alleging deprivations of statutory rights, it does not apply in state courts. There is no merit to this argument. As we have said above, *Martinez v. California,* 444 U.S. 277 (1980), held that sec. 1983 actions may be brought in state courts. Representative Drinan described the purpose of the Civil Rights Attorney's Fees Awards Act as 'authoriz[ing] the award of a reasonable attorney's fee in actions brought in State or Federal courts.' 122 Cong. Rec. 35122 (1976). And Congress viewed the fees authorized by sec. 1988 as 'an integral part of the remedies necessary to obtain' compliance with sec. 1983. S. Rep. No. 94–1011, p. 5 (1976). It follows from this history and from the Supremacy Clause that the fee provision is part of the sec. 1983 remedy whether the action is brought in federal or state court." 448 U.S. at 10–11.

dence to support it. On review, the evidence must be viewed in the light most favorable to the verdict. This is especially true where, as here, the verdict has the approval of the trial court. *Johnson v. American Family Mutual Ins. Co.*, 93 Wis. 2d 633, 644, 287 N.W.2d 729 (1980).

In order to prevail under sec. 1983, the plaintiff must prove that the defendant, acting under color of state authority, deprived the plaintiff of rights, privileges, or immunities secured by the laws or Constitution of the United States. In this case Thompson alleged and the jury found an invidious and intentional discriminatory enforcement of village ordinance number 11.06 in violation of the Equal Protection Clause of the fourteenth amendment. The ordinance forbids minors to play coin operated amusement devices except in the company of a parent or adult guardian.

The facts recounted earlier in this opinion amply demonstrate that sec. 11.06 was enforced against Thompson. The facts recited above also support the jury finding that the conspicuous and intimidating police presence was the primary cause of the decline and eventual failure of Pinnochios. In order to prevail, a plaintiff must further prove that the ordinance was enforced "with an evil eye and an unequal hand," *Yick Wo v. Hopkins*, 118 U.S. 356, 373–374 (1886). There must be a showing of an intentional and systematic discrimination.

Thompson adduced evidence at trial that enforcement of sec. 11.06 against other establishments with coin operated amusement devices was virtually nonexistent. Several witnesses testified that unaccompanied minors were allowed to play pinball and other games unmolested at the Moreway Store and the Hales Corners Bowl. Witnesses observed Hales Corners' police at both locations when such occurred and nothing was done by the

police. In October of 1981, Thompson arranged for four unaccompanied minors to go to the bowling alley to play the pinball and electronic games located there. The minors were allowed to play the games and were given change at the bar without interference from the management or Village authorities. It was stipulated at trial that the only Village records of enforcement of sec. 11.06 at any location were the citations issued to Pinnochios. We conclude that there was credible evidence to support the jury verdict of liability under sec. 1983. We also conclude that there is credible evidence to support the jury's findings of lost investment and profits.

The Village also challenges the form of the special verdict question given to the jury on the sec. 1983 claim. The court's question number nine asked: "Did Hales Corners deprive Plaintiff of his rights in its enforcement of the Code?" to which the jury answered "yes." The Village contends that the question is defective in that its wording assumes a controverted fact. The jury should be required, the Village argues, to make an initial determination that there was enforcement of the ordinance against Thompson before being permitted to consider whether such enforcement violated the Equal Protection Clause. In support of its position, the Village cites a number of negligence cases in which the court's formulation of the question seems to assume a fact relied on to constitute negligence. In those cases, the faulty form of the question was held to be reversible error.

The source of the error in the Village's argument lies in its misapprehension of what constitutes enforcement. The Village insists that because there was never a completed prosecution—because Thompson was never convicted of violation of the ordinance and never paid any fines—the ordinance was not enforced. In that contention, the Village is simply wrong. Any official action

tending to induce or compel compliance with the ordinance is enforcement. The statements and warnings of Village officials and the police presence and searches recited earlier are all acts of enforcement. The uncontroverted evidence that Hales Corners Police issued citations to two Pinnochio employees and a summons and complaint to Thompson is sufficient in itself to establish that the ordinance was enforced. Therefore, a question which implicitly assumes enforcement is not reversible error.

Finally, the Village seeks reversal on the grounds that the trial court erroneously struck from the record certain testimony given by witness Frank Migliano. Mr. Migliano operated a retail pharmacy in the Postal Plaza Shopping Center during the time Pinnochios was in operation. In a pretrial ruling on a motion in limine, the court had ruled that Migliano's testimony was admissible for rebuttal purposes but not for the purpose of establishing an affirmative defense. At the conclusion of Mr. Migliano's testimony, the court, pursuant to a request from counsel for Thompson, admonished the jury that they were not to consider Migliano's testimony concerning the presence of beer cans in the Postal Plaza parking lot, a profanity that had been painted across the window of the pharmacy, Thompson's agreement to regulate young people outside the restaurant and alleged harassment of women patrons of the drug store.

Though the court's reasons for striking the particular testimony it did are not clear, we conclude that the error, if there was any, was not prejudicial. Evidence of the presence of beer cans in the parking lot was properly presented to the jury by other witnesses. Insofar as the purpose of presenting Mr. Migliano's testimony was to establish a reason for the police presence other than enforcement of the ordinance, that purpose was more directly served by testimony of the witness Migli-

ano which was not stricken and other evidence such as police records of calls to Pinnochios. Testimony regarding Migliano's requests for increased police patrols was allowed to stand.

Mr. Thompson also cross appeals from the court's decision on its claim against Nowicki.

Thompson first challenges the jury's verdict on its misrepresentation claim. He contends that the jury's finding is unsupported by the evidence and must be upset.

The only evidence adduced in support of the misrepresentation claim was Thompson's uncorroborated testimony concerning statements supposedly made by Mr. Roscoe Fancher, leasing agent for Nowicki. Thompson testified that Fancher told him he had spoken with the village assessor and building inspector and with members of the village police department concerning the proposed business, all of whom had expressed general approval. Mr. Fancher did not testify. The assessor and building inspector, Mr. Andrew Pushnig, denied having ever spoken to Fancher about Thompson's plans. Likewise none of the police officers who testified mentioned having approved a game room to Fancher. On cross-examination by counsel for Nowicki, Thompson was less clear about the particulars of his conversation with Fancher. He was uncertain whether it was the police department or some other Village official Fancher said he had spoken to.

Thompson argues that the only reasonable conclusion that can be drawn from all the testimony is that Fancher misrepresented having spoken with the Village officials. Obviously, the jury could also choose not to credit Thompson's testimony concerning his conversation with Fancher. The testimony concerned an incident that took place more than three years earlier. Thompson was not certain of the circumstances of the conversation but said

he believed it to have been a phone call. Likewise, he was not certain of the substance of the conversation. By Thompson's own account, during this time Fancher was primarily concerned with assuring himself of the viability of Thompson's venture before agreeing to let the premises. He therefore had no reason to make false representations regarding the absence of legal impediments. By contrast, Thompson had an obvious interest in recollecting the facts in the way he did.

The credibility of the witnesses and the weight to be given to their testimony is left to the judgment of the jury. Where the evidence is susceptible of more than one reasonable inference, the reviewing court will accept the inference drawn by the jury. *Meurer v. ITT General Controls,* 90 Wis. 2d 438, 280 N.W.2d 156 (1979).

Finally, Thompson appeals from the trial court's decision on its claim against Nowicki for rescission of the lease on the grounds of mutual mistake of fact. Question number thirteen of the special verdict asked: "Did Plaintiff and Nowicki enter into the lease under a mutual mistake of fact?" The jury returned an answer of "yes." The court changed the answer to "no." The alleged mistake concerned the existence of village ordinance number 11.06. Thompson contends that the existence of the ordinance so frustrated the intention of the parties in entering into the lease as to constitute grounds for avoidance. We conclude that Thompson is not entitled to rescission on the grounds that, even if the lease is voidable for mistake, Thompson waived his right by his subsequent acts of affirmance.

In January of 1978, Thompson and Nowicki formalized their agreement on the terms of a lease on the building in the Postal Plaza Shopping Center in a document characterized as a "letter of lease." Thompson occupied the premises and began making improvements shortly thereafter. He was made unequivocally aware of ordinance

number 11.06 in early March when a Hales Corners police officer delivered a copy of the ordinance to him. The parties signed a second document, this one labeled a lease, covering the same premises on or about July 20, 1978. Thompson continued in the premises through December.

Ordinarily questions of waiver are questions of fact for the jury. However, this court has held that where the facts relating to the conduct of the parties after discovery of the fraud or mistake are "practically undisputed," the question of waiver is one of law. *Weinhagen v. Hayes,* 174 Wis. 233, 249, 178 N.W. 780 (1920). Although the trial court did not expressly find waiver, it noted that Thompson "did not assert a mistake, nor . . . take any action to terminate the lease, or offer to surrender occupancy" until long after he learned of the mistake.

A party's right to rescind for fraud or mistake is waived if he unreasonably delays in asserting that right or affirms the agreement after learning of the fraud or mistake giving rise to the right of rescission. Restatement of Restitution sections 64, 68 (1937) ; *Weinhagen v. Hayes,* 174 Wis. at 249. In this case, Thompson's failure to assert his rights for more than six months together with his affirmance of the lease as evidenced by the July 20 document constitute a waiver of any right to rescind. Therefore, there was no error in the trial court's changing the jury's special verdict answer on the mutual mistake claim.

*By the Court.*—Affirmed in part, reversed in part and remanded to the circuit court for proceedings not inconsistent with this opinion.

STEINMETZ, J. (dissenting). On the issue of a municipality's limited liability for actions of its employees and officers, I disagree with the majority.

The majority holds: "We conclude that the purpose behind sec. 1983 would be similarly defeated if deprivation of constitutional rights was not fully compensated because of a state statutory recovery ceiling." (*Supra* at 298.) I disagree with this rule and the reasoning of the majority in arriving at it.

Sec. 1983 was a post-Civil War act to assure all citizens of the United States their federal constitutional rights. The case law regarding the act has been spotty at best until the modern civil rights era. As close to present time as 1961, the United States Supreme Court held in *Monroe v. Pape,* 365 U.S. 167 (1961), that: " 'Congress did not undertake to bring municipal corporations within the ambit of [sec. 1983].' " This quote and meaning of *Monroe* is from *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 664 (1978). In the *Monell* case, the Court reversed *Monroe v. Pape* with stare decisis having a life therefore of 17 years in this area of law.

The holding in *Monell* at 694, was:

"We conclude, therefore, that a local government may not be sued under sec. 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under sec. 1983."

However, *Monell* left open the limits of local governmental liability. It said at 695:

"[W]e have no occasion to address, and do not address, what the full contours of municipal liability under sec. 1983 may be. We have attempted only to sketch so much of the sec. 1983 cause of action against a local government as is apparent from the history of the 1871 Act and our prior cases, and we expressly leave further development of this action to another day."

In *Monell,* the Court at 701 significantly held:

"[W]e express no views on the scope of any municipal immunity beyond holding that municipal bodies sued under sec. 1983 cannot be entitled to an absolute immunity, lest our decision that such bodies are subject to suit under sec. 1983 'be drained of meaning,' *Scheuer v. Rhodes,* 416 U.S. 232, 248 (1974). Cf. *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 397–398 (1971)."

In *Carey v. Piphus,* 435 U.S. 247 (1978), the Supreme Court recognized that rights, constitutional and otherwise, do not exist in a vacuum.

In *Carey* at 258, the Court spoke of the difficulty of adopting the common law of compensation for deprivation of constitutional rights but that the task would have to be undertaken.

*Robertson v. Wegmann,* 436 U.S. 584, 590 (1978), held:

"In resolving questions of inconsistency between state and federal law raised under sec. 1988, courts must look not only at particular federal statutes and constitutional provisions, but also at 'the policies expressed in [them].' *Sullivan v. Little Hunting Park, Inc., supra,* at 240; see *Moor v. County of Alameda, supra* at 703. Of particular importance is whether application of state law 'would be inconsistent with the federal policy underlying the cause of action under consideration.' "

In *Robertson,* at 593, the Court stated: "But sec. 1988 quite clearly instructs us to refer to state statutes; it does not say that state law is to be accepted or rejected based solely on which side is advantaged thereby."

In *Robertson,* the dissent criticized the majority opinion for first looking to the state law and its effect on the sec. 1983 action and looking next at "federal common law." But even the dissent recognized the need to "resort to the state statute only if the federal laws 'are not

adapted to the object' of 'protection of all persons in the United States in their civil rights, . . . or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law.' " *Id.* at 595.

*Owen v. City of Independence,* 445 U.S. 622, 640 (1980), held that local governments are subject to liability for acts of individuals when the act done is by express authority of the municipal corporation, where they [the individuals] are empowered to act for the government " 'upon the subject to which the particular act relates; and for any act which, after it has been done, has been lawfully ratified by the corporation,' " citing Shearman, T. and Redfield, A., A Treatise on the Law of Negligence, sec. 120 at 139 (1869).

In *Owen,* at 655, the Court stated:

"Thus, even where some constitutional development could not have been foreseen by municipal officials, it is fairer to allocate any resulting financial loss to the inevitable costs of government borne by all the taxpayers, than to allow its impact to be felt solely by those whose rights, albeit newly recognized, have been violated."

The foregoing is a statement of a benevolent, deep pocket philosophy; however, its true meaning will be known when the court is presented, as here, with a governmental unit of taxpayers the size of South Milwaukee and not a state governmental unit or a municipality the size of Independence, Washington, D.C. or larger. It is incomprehensible that there would be insurance coverage to protect municipal governments for policies or acts of its employees where liability may be established in "newly recognized" violation of previously unknown rights. No insurance company could issue such policy since the premium would not have any certainty nor be based on any predictable experience. If issued, the premiums would by necessity be prohibitive.

In *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), the Supreme Court denied punitive damages against a municipal corporation in a sec. 1983 action and it spoke of *Owen* considering equitable distribution of losses from official misconduct and that punitive damages would unfairly punish for the deeds of "persons over whom they had neither knowledge nor control." *Id.* at 266–67. The significant language used was: "We see no reason to believe that Congress' opposition to punishing innocent taxpayers and bankrupting local governments would have been less applicable with regard to the novel specter of punitive damages against municipalities." *Id.* at 266.

It is incongruous and incomprehensible that the Supreme Court would hold that taxpayers are not subject through their local governmental units for punitive damages for official and intentional policies of their local governments and yet be held to unlimited compensatory damages. Certainly, when the Supreme Court considers the issue of local governments, through state laws limiting their liability, it will display awareness of local governments by nature varying in size and numbers of taxpayers and recognizing the need for limiting liability at a reasonable level.

Under the decision of the majority, a victim of a sec. 1983 violation could, if a jury grants it, recover unlimited dollar amounts and yet, this same Supreme Court of Wisconsin has upheld the permissibility of local units of government to be limited in exposure for serious and crippling physical injuries caused by its officers' and employees' negligence under sec. 895.43, Stats. *Sambs v. City of Brookfield*, 97 Wis. 2d 356, 293 N.W.2d 504 (1980), upheld the then $25,000 limit of liability for torts (other than sec. 345.05, for motor vehicle accidents) as not violating the equal protection clause of the Fourteenth Amendment nor the Wisconsin Constitution Art. I, sec. 1.

Either the *Sambs* case result should be reexamined since insurance protection is available to local governmental units for such predictable torts and resulting injuries, or the majority in the instant case has created an unacceptable dichotomy.

If the government acts with evil intent in its policy, punitive damages are not recoverable. If government has a policy but it is otherwise innocent except for its application, then damages are wide open and unlimited. If the government causes severe injury through the negligence of its officers or employees, its liability is limited to $25,000 (now $50,000) even though it is protected by a greater limit in an insurance policy. This is an area of inconsistencies partly created by the majority's decision in the instant case.

The majority does not state directly who is to receive the attorney fees granted; however, by citing 42 U.S.C. sec. 1988 to the effect that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs," it implies that the plaintiff, Jeff Thompson, is allowed the fees. The court's ruling on the attorney fees means the attorney is still only entitled to the percentage he contracted with his client to accept.

As the majority holds, the attorney will only receive his contingent fee. The greater amount over that recoverable under the majority ruling will go to the plaintiff in addition to his recoverable damages of $88,000. I cannot see how that will encourage attorneys in the future to accept cases in the untrammeled sec. 1983 actions, nor does it meet any logic to allow the plaintiff to recover more than the jury found to be his loss. The intention in allowing a plaintiff to collect attorney fees is to encourage attorneys to accept sec. 1983 causes and to

relieve plaintiffs with legitimate claims of the burden of legal costs. This policy was not intended as a reward for successful claimants nor as a penalty against the government.

In the instant case, I disagree with the rationale of the majority only, not the result as to the attorney fees. The majority's ruling as to unlimited liability exposure for the municipality results in upholding the $88,000 damage award. One-third of $88,000 is $29,333, one-fourth of $88,000 is $22,000, one-half of $88,000 is $44,000, so whatever the contingent fee arrangement is, the majority's award of $23,180 to the plaintiff for attorney fees does not unjustly enrich the plaintiff. However, the reasoning of the majority in adopting the rule as to attorney fees can lead to punishment of defendants for defending rather than reimbursing plaintiffs for initiating the action.

I would reverse the trial court.